UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | NO. 19-104-JWD-EWD |
| KEONTA JACKSON a/k/a KEONTA WELCH | |

**RULING AND ORDER**

This matter comes before the Court on the *Motion to Suppress* (Doc. 17) by Defendant Keonta Jackson *a/k/a* Keonta Welch ("Defendant" or "Jackson"). The United States of America ("Government") has filed a response. (Doc. 21.) An evidentiary hearing was held on March 4, 2020. (*See* Docs. 28, 29.) Defendant filed a post-hearing brief (Doc. 31), and the Government responded, (Doc. 32). Further argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, Defendant's motion is denied.

I. **Relevant Background**

A. **The *Terry* Encounter**

This is a *Terry* frisk case. In sum, on June 4, 2019, Defendant was traveling on his bicycle against traffic near the 7400 block of Mickens Road when (now Detective) Kevin Miller conducted a traffic stop. Miller eventually frisked Jackson and found a firearm in his right inner waste band. Defendant has been charged with one count of being a felon in possession. (Doc. 1.)

More specifically, Miller conducted the traffic stop around 11:30 a.m. on June 4, 2019. (Tr. 10, 16.)[1] "It was extremely hot. One of the hotter days [Miller] remembers that summer." (Tr.

---

[1] All references to "Tr." are to the transcript of the March 4, 2020, suppression hearing. (Doc. 29.)

11.) It was "sunny, no overcast" with temperatures "around 94, 95-degrees." (Tr. 11.) "It was a very hot day." (Tr. 11.)

Miller first introduced himself and let Defendant know why Miller stopped him. (Tr. 38.) Because Defendant was sweating, had been riding down Mickens, and had worn such a heavy jacket, Miller began to ask Defendant "where he was going or where he was coming from to get an idea of why he was doing that." (Tr. 38–39.) Miller asked for Jackson's ID and needed his name, date of birth, and other information to issue a ticket. (Tr. 39–40.) Miller wanted "to get an idea of kind of his movements, his whereabouts, and also just if he had weapons." (Tr. 51.)

Defendant stated that he "was going to a friend's house in Sharon Hills" from his house on Joor. (Tr. 19.) This "kind of spiked [Miller's] attention because we had a couple recent burglaries around that area." (Tr. 19.)

Miller testified that Defendant appeared nervous responding to his questions. (Tr. 19.) "It just was kind of evasive, kind of closed posture to kind of face away from me, hesitant to answer things." (Tr. 41.) Defendant's "body language . . . was more closed off, to kind of shy away from." (Tr. 41.)[2] Miller elaborated that, when Defendant said "No," "It's a hesitant kind of like leave me alone no. I don't want to talk about it." (Tr. 42.) Miller explained that it was the way Defendant said no; "It was not, I ask you a question, No. It was hesitant. Like do I want to say something else or I'm just going to say no." (Tr. 42.)

Miller also testified that Defendant had a "pretty heavy jacket which was odd because it was so hot that day." (Tr. 14; *see also* Tr. 17 ("fairly heavy jacket"); U.S. Exs. 6, 6A (showing inside and outside of Defendant's heavy jacket); *but see* Tr. 61 (Defendant's stepfather testifying that the jacket was a Dickie's brand work jacket).) When Miller asked Defendant "why he was

---

[2] Miller conceded though that a lot of the general public is a little nervous around law enforcement and that that doesn't necessarily mean they are committing a crime. (Tr. 41.)

2

wearing such a heavy jacket," Jackson "replied that he did not have a nice shirt" and that his "shirt had holes in it, so he wore his jacket to cover his shirt." (Tr. 20.) Jackson opened up his jacket to reveal an "Under Armor style shirt." (Tr. 20.) Miller said "that still seemed kind of odd, because even though he said he had holes and a torn-up shirt, the shirt seemed in fairly good condition. So it just made [Miller] believe that [Jackson] was not being truthful at that point." (Tr. 20.) Defendant was sweating. (Tr. 20.) Miller testified that Jackson's reason for the jacket "didn't seem reasonable. Just with the condition of the shirt he had under and just the extreme heat it didn't seem reasonable." (Tr. 20.)

Miller stated that the jacket and unreasonable explanation concerned him because "typically, just in experience with things like that, . . . in the past experience people have tried to conceal items, being contraband or weapons or any other objects." (Tr. 21.) Miller had worked in law enforcement since 2014, serving the longest in uniform patrol. (Tr. 6.) In that capacity, he had conducted "several hundred" traffic stops. (Tr. 6.) He was also promoted to a homicide detective and received deputy of the month in 2019. (Tr. 7-8.)

After Miller asked Defendant about the jacket, Miller then asked him if he had any weapons, and Jackson replied that he didn't. (Tr. 21.) Miller was still suspicious at this point because "once again, just his answers. It was not something that was reasonable. The way he was dressed, [Miller] was just concerned that he could be concealing something." (Tr. 21-22.) But Miller freely admitted that Defendant made no sudden movements and did not threaten him. (Tr. 42.)

Miller asked Defendant to empty his pockets because he had "bulky items in them," and he "began to put things on [Miller's] hood." (Tr. 19.) While Defendant removed some items from his jean pockets (his cell phone, keys, a lighter, and a cigar), his jeans were tight, and Miller noticed

3

a "small bulge in the top right, almost like a watch pocket, of his jeans." (Tr. 22.) "It was not very large. It was maybe about the size of a quarter but cylinder (sic) and it just fit right in the upper right pocket." (Tr. 22.)

Miller did not believe that Jackson fully complied with his request; "[i]t was pretty clear that something was still in there." (Tr. 22.) This "just further went along that [Miller] felt like [Jackson] wasn't being completely honest and forthcoming." (Tr. 22.)

Miller then asked Defendant again if he had any weapons, and Jackson replied no. (Tr. 23.) At that point Miller told Defendant he would check him for weapons "because [Miller] was going to return to [his] vehicle" and "wasn't going to leave him standing there and ultimately turn [his] back to get to [his] car." (Tr. 23.) Miller discovered the firearm. (Tr. 23.) Miller testified that he would not have been able to see the gun but for the jacket and that he believed the jacket was hiding it. (Tr. 24.) The bulge in his pocket "turned out to be about a gram of marijuana." (Tr. 24.) At the time, Miller did not believe the bulge to be a weapon. (Tr. 44.)

The entire encounter between when Miller stopped the Defendant and when he found the gun was "a couple minutes. It was not very long." (Tr. 26; *see also* Tr. 38.) Miller estimated it was no more than "two or three minutes. It was fairly quick." (Tr. 51.)

### B. Miller's Usual Practice for Frisks

Defense counsel asked Miller if he had a policy of always conducting *Terry* frisks when he walks back to the car. (Tr. 44.) Miller said he "wouldn't say it's policy. It's kind of situational. If he had on clothing where [Miller] could see his waistband, [Miller] would probably just check it because of his shirt and pants being so tight." (Tr. 44.)

Miller was asked if he recalled testifying in another proceeding that, "Typically I won't leave someone standing while I walk away from them. If I'm contacting even on a basic traffic

4

stop, if somebody is out of the car, I'm not going to turn my back to them until I make sure there's no weapons involved." (Tr. 44.)  Miller clarified, "Yes, but . . . making sure they don't have weapons doesn't always entail a frisk.  If they have on yoga pants and a jacket and I can clearly see - - I mean, not a jacket, a shirt, and I can clearly see there's no weapons.  So that's why I'm going to make sure I am walking away as safe as possible before." (Tr. 44–45.)  Jackson said it was a "general policy toward everyone." (Tr. 45.)  When asked if there was anything specific about Jackson that made Miller feel he was armed and dangerous, Miller replied:

> A:   Just the fact that I couldn't see the rest of his waistline and he had on . . . [a jacket]. . . . [H]is clothing and that situation presented a safety risk because I did not know.  And at that point I wanted to be sure before I go sit in the unit and leave somebody standing up outside.
>
> Q:   So anybody that wears a jacket you would be concerned, correct?
>
> A:   Not necessarily.  It's circumstantial.  If the weather's permitted and it's a very generic traffic stop where I'm just issuing a ticket and letting someone go or a warning and they're not getting out of a vehicle or standing in front of my patrol until while I conduct business sitting down where my attention is going to be off of them, I wouldn't necessarily conduct a *Terry* frisk. . . .

(Tr. 45.)  Miller continued:

> The overall circumstance made me feel that he could be possessing a weapon.  Just like I said, that closed-off-ness and body posture, his clothing in that temperature, even his cooperation with taking stuff out of his pocket, it was - - it was kind of let me give you what you want so that you don't dig too deep. . . . it was kind of let me give you something to say as if I'm cooperating so that we can get on with this.

(Tr. 46.)  Miller said, "I didn't have a belief of anything at that point. . . . I was trying to figure out why he was acting that way, if that makes sense." (Tr. 47.)  Miller clarified that he did "to some extent" have a reasonable belief and that, "When I go into a traffic stop, I don't know for certain anything in a traffic stop until it's done." (Tr. 47.)  Anyone could have a weapon, and Defendant was no different than anyone else in that sense. (Tr. 47.)

      Miller later defined a "basic traffic stop" as the following:

5

> A basic traffic stop is I pull you over. You're in your car. I walk up. I identify myself. I gather your information. I return to my car. I run your information. Either you get a warning or you get a citation. If at any point somebody gets out of the car or if I ask them to get out of the car and they're going to stay out of the car and I'm going to return to my unit, I'm going to make sure they don't have weapons before I do so.

(Tr. 48.) Miller wouldn't call it a "blanket rule"; rather; "in a matter to keep every safe, yes. [He] will make sure, if possible and reasonable, that someone doesn't have a weapon standing outside of [his] unit before [he] get in it." (Tr. 48–49.)

## II.   Parties' Arguments

Defendant originally contended that he was lawfully traveling on the road when Miller stopped him. In post-hearing briefing, Defendant conceded that he was traveling down the wrong side of the road and that, consequently, the initial stop was lawful. (Doc. 31 at 2.)

But Defendant still argues that the frisk was unlawful. According to Defendant, the only basis for the stop was that he was wearing a jacket in the heat, appeared nervous, and had a bulge in his pants pocket. Defendant responds:

(1) The jacket was a Dickie's brand work jacket that Jackson commonly wore, and, in any event, there is no connection between wearing jackets and criminal activity;

(2) nervousness, by itself, does not justify a search;

(3) the bulge was the size of a quarter, Miller did not believe it to be a gun, and, in any event, Miller searched Jackson's waistband first rather than the bulge; and

(4) Miller did not have a particularized fear that Jackson was armed and dangerous; rather, Miller only had a generalized belief that Defendant was hiding something and operating under Miller's standard practice to search suspects.

Finally, this case is different than others that have found a reasonable belief, as this was not a high crime area, Defendant did not flee, and there was no knowledge of a prior record or gang affiliation.

The Government responds that there was a reasonable belief based on specific articulable

6

facts that Defendant was armed and dangerous. The Court is to look at the totality of the circumstances to determine if the frisk was reasonable, even if the officer does not articulate on the stand that he thought he was in danger and even if certain actions appear innocent by themselves. After citing certain examples from case law, the Government urges that Miller acted reasonably because:

(1) Defendant was wearing a coat on a "hot, sunny summer day, which made Miller think he was wearing it to conceal something he did not want people to see," and which was particularly suspicious because he was "sweating profusely" (Doc. 32 at 6–7);

(2) Defendant's "demeanor was evasive," his "body language [was] closed off[,]" he "tried to turn away during their encounter," and he "behaved nervously while talking to Miller," (*id.* at 7);

(3) Jackson's answers to Miller's questions were "illogical[] and improbable[,]" and he "lied to Miller about why he was wearing his coat, claiming he did not have a nice shirt" when his shirt in fact "appeared new," (*id.*);

(4) Defendant was alone on the road with Defendant, which heightened the risk; and

(5) Miller had five years of experience which included hundreds of traffic stops.

Lastly, the Government maintains that Defendant ignores certain testimony that makes it clear that Miller did in fact have specific facts to believe that Defendant was armed and dangerous and that Miller did not act solely according to a general policy of frisking everyone.

### III. Discussion

#### A. General Principles

"The Fourth Amendment guarantees that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'" *United States v. Hunt*, 253 F.3d 227, 230 (5th Cir. 2001) (quoting U.S. CONST. amend. IV). "The essential purpose of the Fourth Amendment is to impose a standard of 'reasonableness'

7

upon law enforcement agents and other government officials in order to prevent arbitrary invasions of the privacy and security of citizens." *Id.* (citing *Delaware v. Prouse*, 440 U.S. 648, 653–54, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979)). Accordingly, "[t]he Supreme Court has determined that warrantless searches and seizures are per se unreasonable unless they fall within a few narrowly defined exceptions." *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir. 1993) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971)).

While generally the defendant bears the burden on a motion to suppress, the Fifth Circuit has stated that one situation in which the burden shifts to the Government is when a defendant shows that he was subject to search without a warrant. *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993) (citing *United States v. De La Fuente*, 548 F.2d 528, 533 (5th Cir. 1977)). Consequently, because such was the case here, the Government bears the burden of proving the legality of the stop and the warrantless search by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 178 n. 14, 94 S. Ct. 988, 996, 39 L. Ed. 2d 242 (1974).

### B. Law on *Terry* Frisks

The Fifth Circuit analyzes the constitutionality of traffic stops under the standard articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). *United States v. Berry*, 664 F. App'x 413, 418 (5th Cir. 2016) (per curiam) (citing *United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013)). *Terry* articulated a two-part test, which asks: (1) whether the officer's action was "justified at its inception," and (2) whether the officer's subsequent actions were "reasonably related in scope to the circumstances that justified the interference in the first place." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *Terry*, 392 U.S. at 19-20, 88 S. Ct. 1868).

Similarly, "[p]olice officers may briefly detain individuals on the street, even though there is no probable cause to arrest them, if they have a reasonable suspicion that criminal activity is afoot." *United States v. Michelletti*, 13 F.3d 838, 840 (5th Cir. 1994) (en banc). "The Fourth Amendment requires only some minimum level of objective justification for the officers' actions—but more than a hunch—measured in light of the totality of the circumstances." *Id.* (citing *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585, 104 L. Ed. 2d 1 (1989); *United States v. Sanders*, 994 F.2d 200, 203 (5th Cir. 1993); *United States v. Rideau*, 969 F.2d 1572, 1574 (5th Cir. 1992) (en banc)). "Reasonable suspicion must be supported by particular and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant an intrusion." *Id.* (citing *United States v. Galberth*, 846 F.2d 983, 989 (5th Cir. 1988) (citing *Terry*, 392 U.S. at 19, 88 S. Ct. at 1878–79)).

The Supreme Court has "recognized that law enforcement officers need to protect themselves and the public at large from violence that may ensue in the course of such encounters." *Rideau*, 969 F.2d at 1574. "It therefore held that if police officers are justified in believing that the individuals whose suspicious behavior they are investigating at close range are armed and presently dangerous to the officers or to others, they may conduct a limited protective search for concealed weapons." *Id.* (citing *Terry*, 392 U.S. at 24, 88 S. Ct. at 1881; *Adams v. Williams*, 407 U.S. 143, 146, 92 S. Ct. 1921, 1923, 32 L. Ed. 2d 612 (1972)). "An officer need not be certain that an individual is armed; the issue is whether a reasonably prudent man could believe, based on 'specific and articulable facts,' that his safety or that of others is in danger." *Id.* (quoting *Terry*, 392 U.S. at 27, 88 S. Ct. at 1883; *Maryland v. Buie*, 494 U.S. 325, 332, 110 S. Ct. 1093, 1097, 108 L. Ed. 2d 276 (1990)).

"In assessing reasonableness, 'due weight' must be given to the facts and inferences viewed

9

'in light of [the officer's] experience.' " *Michelletti*, 13 F.3d at 841 (quoting *Terry*, 392 U.S. at 27, 88 S .Ct. at 1883). "Factors that ordinarily constitute innocent behavior may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced officers." *United States v. Tuggle*, 284 F. App'x 218, 228 (5th Cir. 2008) (per curiam) (quoting *United States v. Holloway*, 962 F.2d 451, 459 (5th Cir. 1992)).

Additionally, "[i]n assessing the reasonableness of an officer's actions, 'it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?' " *Rideau*, 969 F.2d at 1574 (quoting *Terry*, 392 U.S. at 22, 88 S. Ct. at 1880 (citations omitted)). "The officer's state of mind, or his stated justification for his actions, is not the focus of our inquiry." *Id.* (citing *Maryland v. Macon*, 472 U.S. 463, 470–71, 105 S. Ct. 2778, 2782–83, 86 L. Ed. 2d 370 (1985); *Scott v. United States*, 436 U.S. 128, 138–39, 98 S. Ct. 1717, 1723–24, 56 L. Ed. 2d 168 (1978); *United States v. Colin*, 928 F.2d 676, 678 (5th Cir. 1991)). "As long as all the facts and circumstances, viewed objectively, support the officer's decisions, the Fourth Amendment is satisfied." *Id.* "We must attempt to put ourselves in the shoes of a reasonable police officer as he or she approaches a given situation and assesses the likelihood of danger in a particular context." *Id.*

### C. Analysis

Having carefully considered the matter, the Court finds that, based on the totality of the circumstances, a reasonable officer in Miller's shoes would have believed, based on specific and articulable facts, that he was in danger and that Defendant was armed and dangerous.

Again, "[i]n assessing reasonableness, 'due weight' must be given to the facts and inferences viewed 'in light of [the officer's] experience.' " *Michelletti*, 13 F.3d at 841 (quoting

10

*Terry*, 392 U.S. at 27, 88 S .Ct. at 1883). "Factors that ordinarily constitute innocent behavior may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced officers." *Tuggle*, 284 F. App'x at 228 (quoting *Holloway*, 962 F.2d at 459). One such factor is whether Defendant is wearing items that "easily could conceal a weapon." *See United States v. Matchett*, 802 F.3d 1185, 1192–93 (11th Cir. 2015) (affirming denial of motion to suppress and noting this fact in totality of the circumstances analysis); *cf. Sanders*, 994 F.2d at 207 (finding that officer did not act unreasonably in drawing his firearm when he confronted defendant in part because defendant was "wearing, among other articles of clothing . . . a tan jacket which concealed the area around his waistband" and because "[a] firearm or other weapon could have been concealed under such a jacket with ease.").

Here, Defendant was sweating while wearing a "pretty heavy" jacket on an extremely hot summer day. (Tr. 10–11, 14, 20, 38–39; U.S. Exs. 6, 6A.) Miller's justification was that, although Defendant said he "did not have a nice shirt" and that his shirt had "holes" in it, Miller said the Under-Armor-style shirt was in "fairly good condition." (Tr. 20.) Miller testified that the jacket and unreasonable explanation concerned him because "typically, just in experience with things like that, . . . in the past experience people have tried to conceal items, being contraband or weapons or any other objects." (Tr. 21.) It must be noted that Miller had over five years' experience in law enforcement, had conducted "several hundred" traffic stops, and had received an award and promotion for his performance. (Tr. 6–8.) All of this weighs in favor of finding that Miller's actions were reasonable under the circumstances.

Other factors are also worth noting and weigh in the Government's favor. Defendant initially stated that he "was going to a friend's house in Sharon Hills," and this "kind of spiked [Miller's] attention because we had a couple recent burglaries around that area." (Tr. 19.) While

11

this statement may be innocent by itself, it is certainly something a reasonable officer would consider with the other facts described above. *Cf. United States v. Monsivais*, 848 F.3d 353, 361 (5th Cir. 2017) (stating that, there, unlike other factual situations where frisks are justified (such as "when an individual flees from police in a high-crime area" or "when the officers are already patrolling the area in response to a specific report of criminal activity"), defendant's "exercise of his right to avoid contact with the police and to go about his business offer[ed] no such linkage to reasonably suspected criminal activity."). Further, Miller was "alone during the encounter, which bolstered his reasonable concern for his safety." *Matchett*, 802 F.3d at 1193.

Defendant is correct that "[n]ervousness, standing alone, generally is not sufficient to support reasonable suspicion." *Monsivais*, 848 F.3d at 359 (quoting *United States v. Macias*, 658 F.3d 509, 520 (5th Cir. 2011)). But, "nervous, *evasive* behavior is a pertinent factor in determining reasonable suspicion." *Id.* (emphasis by *Monsivais*) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000)).

Here, Miller—who was an extremely credible witness—described in detail how Defendant's body language and way of answering him (including in response to questions about whether he had weapons) appeared nervous and hesitant. (*See* Tr. 19, 41–42.) Additionally, Defendant's unreasonable response about the heavy jacket (i.e., his falsely claiming that his shirt was in bad condition) and his failure to fully comply with Miller's request to empty out his pockets qualify as evasive behavior. (*See* Tr. 19–22.) In short, the Court finds that this conduct was certainly a factor supporting a finding of reasonable suspicion.

Defendant also complains about Miller having a general, blanket rule to frisk all suspects at traffic stops and him supposedly not having reasonable suspicion to conduct the specific frisk on Defendant. A fair reading of Miller's testimony as a whole contradicts this position. (*See* Tr.

12

44–45 ("It's kind of situational" and depends on the clothing worn by the detainee); Tr. 45–46 ("It's circumstantial. If the weather's permitted and it's a very generic traffic stop . . . . I wouldn't necessarily conduct a *Terry* frisk. . . . The overall circumstance made me feel that [Defendant] could be possessing a weapon."); Tr. 48–49 (stating that he wouldn't call it a "blanket rule"; rather; "in a matter to keep every safe, yes. [Miller] will make sure, if possible and reasonable, that someone doesn't have a weapon standing outside of my unit before I get in it.").

But, even assuming Miller had testified to this effect, "[these] statement[s] somewhat detract[] from [the Court's] position but do[] not prove that [Miller] had no reason to be concerned about [Defendant]." *Michelletti*, 13 F.3d at 842. Again, "[a]n officer need not be certain that an individual is armed; the issue is whether a reasonably prudent man could believe, based on 'specific and articulable facts,' that his safety or that of others is in danger." *Rideau*, 969 F.2d at 1574 (citation omitted). "The officer's state of mind, or his stated justification for his actions, is not the focus of our inquiry." *Id.* (citations omitted).

For example, in *Michelletti*, the Fifth Circuit found that an officer's testimony that, "before the patdown, he had no specific reason to believe [defendant] was armed" did "not prove that [the] Officer had no reason to be concerned about [defendant]." *Michelletti*, 13 F.3d at 842. The appellate court explained, "If the officer had an objective factual basis for then thinking there was a real risk to his own safety, his later verbalization of his thoughts or feelings can hardly be dispositive of the on-the-scene reasonableness of conducting a protective search for weapons." *Id.* (citation omitted). The officer's "subjective feelings may have been equivocally expressed, but his testimony clearly shows that he felt a risk of danger, and had a subjective awareness of facts justifying such an apprehension." *Id.* (citations omitted).

The same reasoning applies here. Even if Miller stated on the stand that he lacked a specific

13

reason to believe that Defendant was armed (which he did not, when reading his testimony as a whole), the key question is whether a reasonable officer in his position would objectively have reasonable suspicion to believe Defendant was armed and dangerous. The Court finds that Miller's frisk satisfies this test.

Moreover, this case is distinguishable from *Monsivais*, the main case which Defendant relies upon for the proposition that nervousness alone is insufficient. There, the Government failed to demonstrate that the "totality of the circumstances prior to the seizure of [defendant] supports a reasonable suspicion of criminal activity." *Monsivais*, 848 F.3d at 359. In *Monsivais*, "there [wa]s no evidence that [defendant] acted evasively." *Id.* Further, "Monsivais complied each time [the] Deputy . . .asked him to remove his hands from his pockets." *Id.* There, the officers "did not testify that [the defendant] appeared to be holding something suspicious or dangerous in his pockets. To the contrary, the officers testified that Monsivais was polite and cooperative[.]" *Id.* at 359–60. It was also "not clear that there was any inconsistency in [defendant's] story." *Id.* at 360. Even looking at the facts together, the Fifth Circuit saw "no objectively logical path of deduction that leads to reasonable suspicion of criminal activity at the time of [defendant's] seizure and detention." *Id.* at 363.

This case is different. Here, based on the totality of the circumstances—including Defendant's wearing odd clothing that could easily conceal a weapon (a heavy coat on an extremely hot summer day), his nervousness (particularly in response to questions about whether he had a weapon), his evasiveness (including his manner of answering, his unreasonable and false explanation, and his failure to comply with instructions by hiding something in his pocket), the reasonable connection to some criminal activity (i.e., Defendant stating that his destination was where recent burglaries had taken place), Miller's experience (including five years and hundreds

14

of traffic stops), and the heightened danger inherent in the encounter (by the fact that Miller was alone with Defendant)—the Court finds that Miller was justified in believing that Defendant, whose suspicious behavior he was investigating at close range, was armed and presently dangerous. As the *Terry* court stated (in a not identical but sufficiently analogous context):

> We cannot say his decision at that point to seize [the defendant] and pat his clothing for weapons was the product of a volatile or inventive imagination, or was undertaken simply as an act of harassment; the record evidences the tempered act of a policeman who in the course of an investigation had to make a quick decision as to how to protect himself and others from possible danger, and took limited steps to do so.

*Michelletti*, 13 F.3d at 844 (quoting *Terry*, 392 U.S. at 28, 88 S. Ct. at 1883). In sum, Miller's conduct was reasonable under the circumstances. As a result, Defendant's motion will be denied.

### IV. Conclusion

Accordingly,

**IT IS ORDERED** that the *Motion to Suppress* (Doc. 17) filed by Defendant Keonta Jackson *a/k/a* Keonta Welch is **DENIED**.

Signed in Baton Rouge, Louisiana, on May 14, 2020.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**